# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

GREAT AMERICAN INSURANCE )
COMPANY, et al., )
  )
              Plaintiffs, )
  ) Docket no. 2:10-cv-00294-GZS
v. )
  )
JOHN PRIDE, et al., )
  )
              Defendants. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This admiralty action arises from the onboard fire and sinking of the F/V KIMBERLY

MARIE on July 12, 2008. Plaintiffs Kenneth Johnson, the vessel's owner, and Great American

Insurance Company, the vessel's insurer, claim that the fire and sinking were caused by the

negligence and breach of the implied warranty of workmanlike performance of Defendants

Stuart Caldwell and John Pride, the vessel's electrician and mechanic. The Court held a bench

trial on October 11-13, 2011, at which it received documentary evidence and witness testimony.

The bench trial transcript was filed on November 10, 2011 (Docket #s 72-74, 77).[1] The parties

filed Proposed Findings of Fact and Conclusions of Law (Docket #s 78, 80, 83) and Post-Trial

Briefs (Docket #s 79, 81, 82) on December 9, 2011. In accordance with Federal Rule of Civil

Procedure 52, the Court has reviewed all of the evidence presented and now FINDS for

Defendants. Specifically, the Court makes the following findings of fact and conclusions of law:

---

[1] A corrected trial transcript (Docket # 77) was filed on December 1, 2011.

# I.     FINDINGS OF FACT

**The Parties and Witnesses**

1.     Plaintiff Kenneth Johnson ("Plaintiff" or "Johnson") is a resident of Harpswell, Maine. Johnson has worked on lobster boats for over thirty years. In 2004, Johnson bought his fourth lobster boat,[2] a forty-four foot, eleven inch Dixon, for $172,000. He named it the KIMBERLY MARIE after his wife. Johnson fished primarily out of Cundy's Harbor, Maine.

2.     Plaintiff Great American Insurance Company ("Great American") is a corporation with headquarters in Cincinnati, Ohio. Great American insured the KIMBERLY MARIE and, after its sinking, paid the proceeds of the $174,000 insurance policy to Johnson.

3.     Defendant John Pride, owner of Defendant John B. Pride, Inc., a/k/a John Pride, Inc. (hereinafter "Pride"), is a resident of the State of Maine and a diesel mechanic. Pride has been a diesel engine mechanic for approximately thirty years, and he has worked on the engines of hundreds of commercial lobster fishing vessels. Pride has experience working on the engine at issue in this case, the Caterpillar 3406-E, and he worked on the KIMBERLY MARIE several times before the events involved in this case.

4.     Defendant Stuart Caldwell, owner of Defendant Caldwell Marine Electronics, Inc. (hereinafter, "Caldwell"), is a resident of Orr's Island, Maine. Caldwell is a self-employed marine electrician, and has been a marine electrician for approximately twenty-five years. During his career, Caldwell has worked as an electrician on numerous lobster boats and on ships for the United States Navy and Coast Guard. Despite his experience, Caldwell does not hold an electrician's license and he does not have any electrician certifications. Caldwell and Johnson have known each other for more than twenty years. Prior to the incident at issue, Caldwell had

---

[2] Although the F/V KIMBERLY MARIE was primarily used for lobstering, it was also equipped with a tower and a pulpit for tuna fishing.

worked as an electrician on the KIMBERLY MARIE several times. Caldwell's work included the installation of all the electrical equipment onboard the KIMBERLY MARIE. Prior to working on the KIMBERLY MARIE, Caldwell worked on several of Johnson's other lobster boats. After the KIMBERLY MARIE sank, Johnson hired Caldwell to rewire the boat that Johnson purchased to replace the KIMBERLY MARIE.

5.      Kimberly Johnson testified at trial. She was married to Plaintiff Kenneth Johnson in the years leading up to and during the events at issue in this case.

6.      William Hartley testified at trial. Hartley is a marine and industrial diesel engine mechanic who has worked on numerous lobster boats during his career. He occasionally works with Defendant Pride as a subcontractor.

7.      William Brindamour testified as an expert on behalf of Plaintiff Great American. Brindamour is an accredited marine surveyor, accredited by the Society of Accredited Marine Surveyors. In his capacity as a marine surveyor, Brindamour inspects boats to determine condition, suitability for intended use and purpose, and value.

8.      David DuBois testified as an expert on behalf of Plaintiff Great American. DuBois served in the U.S. Coast Guard from 1969 until 1980, which included two tours of duty in the Marine Inspection Office. Upon leaving active duty in 1980, DuBois founded Marine Safety Consultants, Inc., which conducts condition and value surveys of boats and ships and investigates accidents involving boats and ships and marine facilities and injuries aboard vessels. DuBois still works for this company. DuBois has experience investigating matters involving fires and sinking of vessels as well as marine electrical matters.

9.      James Cominskey testified as an expert on behalf of Defendants. Cominskey is an instructor at The Landing School of Boat Building and Design, a post-secondary school

providing training in yacht design, small craft design, building with composite materials, building with wood, and installing and servicing systems onboard boats. Cominsky teaches a course dealing with structures on boats and a second course dealing with the systems and the installation of systems on boats, including the plumbing systems, electrical systems, and engine support systems, which include fuel, water, and oil systems.

10.     Roger Hellyar-Brook testified as an expert on behalf of Defendants. Hellyar-Brook has been an instructor at The Landing School since 1998. He teaches a course dealing exclusively with systems onboard boats. The course covers electrical, diesel, propulsion, air conditioning, and refrigeration systems.

**The F/V KIMBERLY MARIE**

11.     In 2004, Johnson purchased the KIMBERLY MARIE in used condition from an owner in Canada. The KIMBERLY MARIE came with a Caterpillar 3406-E diesel engine equipped with an electronic computer module ("ECM").

12.     In general, the ECM on a 3406-E monitors the engine's performance and fuel flow and sends signals – via fault codes – to the wheelhouse if the engine is not performing properly. For example, the ECM is designed to provide an alert to the wheelhouse if there is a drop in the fuel pressure of the engine.

13.     The ECM on the KIMBERLY MARIE was mounted on the aft port side of the engine and was comprised of a plate cooler and a computer – or control module – separated by the exterior wall of the plate cooler. Wires sending signals to and from the ECM traveled through plugs connected to the ECM. The plugs themselves were covered by a rubber boot, which served as a protective shield over the plugs to keep them clean and dry. The ECM itself was cooled by a fuel cooling system whereby fuel oil passed through the ECM and carried away

the heat generated by the electronics on the ECM. A pump on the engine sucked the fuel out of the fuel tank, through the ECM, and throughout the rest of the fuel system on the engine. The fuel was segregated from the circuitry of the ECM by various seals and plates, including gaskets, which are commonly called O-ring seals.

14.     Soon after purchasing the KIMBERLY MARIE, Johnson purchased additional equipment to outfit the boat, including a new generator, a new life raft, survival suits, flares, a carbon monoxide alarm system, an emergency beacon, and new electronics.

15.     When Johnson purchased the KIMBERLY MARIE in 2004, the engine already had approximately 9,500 hours of use on it.

16.     Caterpillar 3406-E engines like the one in the KIMBERLY MARIE are usually rebuilt after approximately 10,000 hours of use. Prior to the sinking of the KIMBERLY MARIE, Pride informed Johnson that the vessel's engine was near the end of its useful life.[3]

17.     In December 2007, the engine on the KIMBERLY MARIE had approximately 12,950 hours on it, and by July 2008 the engine had been used more than 13,000 hours. Johnson never rebuilt the engine on the KIMBERLY MARIE.

18.     Because of the age of the engine, Pride advised Johnson to run the engine of the KIMBERLY MARIE below 1,400 RPMs rather than taking the boat to a higher speed. The engine of the KIMBERLY MARIE was rated to 2,300 RPMs, but Johnson generally adhered to Pride's advice. However, on several occasions Johnson took the boat to approximately 2,500 RPMs when he was around other lobstermen.

19.     Pride first observed the engine of the KIMBERLY MARIE in late 2004 or early 2005. As Pride testified, when he first saw the KIMBERLY MARIE's engine, the clamps were

---

[3] To the extent that there was disputed testimony on these points, the Court also credits the testimony of Defendant Pride.

rusted, hoses were deteriorating, paint was on the engine, the engine was rusty, and there were issues with the exhaust system. As Pride testified, Johnson was competent at changing oil filters, but he failed to satisfactorily maintain hoses, clamps, and other items related to maintaining the engine on the KIMBERLY MARIE.

20.     In 2005, Johnson considered selling the KIMBERLY MARIE so that he could spend less time fishing and more time with his family. Using a broker, Johnson listed the KIMBERLY MARIE for $275,000 and received a bid for $214,000. Johnson, however, decided against selling the boat and continued to fish for lobster.

21.     In 2006, William Brindamour inspected the KIMBERLY MARIE and valued the vessel at $205,000 at that time. Brindamour testified that in general the value of boats dropped in 2008 and 2009 approximately twenty five to thirty percent.

22.     As Brindemour testified, by 2006 the engine on the KIMBERLY MARIE was properly considered "old." Nonetheless, as of 2006, the fuel system was in satisfactory repair and there were no leaks or cracks or any issues with the fuel lines on the vessel.

**Repairs Immediately Preceding the Fire and Sinking**

23.     In late June or early July of 2008, while out lobstering, Johnson experienced an electrical malfunction onboard the KIMBERLY MARIE. Johnson requested Caldwell's assistance to address the problem.

24.     Upon arriving at the vessel, Caldwell inspected the area around the alternator and observed a burned wire. He replaced the wire and installed a circuit breaker to ensure that the wire would not burn again. Caldwell tested the wire to ensure that it would not burn again, and it did not. After installing the circuit breaker, Caldwell did not observe any stray current, but he was unable to determine what had caused the wire to burn. Accordingly, Caldwell recommended

that Johnson remove the alternator and get it checked. Together, Caldwell and Johnson removed the alternator.

25.     Plaintiff's expert, David DuBois, testified that Caldwell's installation of a circuit breaker constituted good practice. The Court credits DuBois' testimony in this regard.

26.     Johnson brought the alternator to Morin's Auto Parts in Brunswick, Maine where the alternator was tested and found to have no significant issues.

27.     Johnson and Caldwell returned to the boat and Caldwell reinstalled the alternator. During the reinstallation, Caldwell's screwdriver slipped and hit the engine block, which resulted in a large spark. Caldwell worked to locate the source of the electrical current that had caused the spark. He disconnected all batteries in the boat and then located the wiring harnesses attached to the ECM. Caldwell attempted to unplug the wires running into the ECM. The plugs were covered by rubber boots. Instead of unplugging the wires, however, Caldwell pulled the wires completely out of the plugs, which resulted in a significant number of loose wires dangling in Caldwell's hand.

28.     When Caldwell peeled back the rubber boots covering the plugs, he noticed a small amount of fluid in the boots, which he assumed was diesel fuel.

29.     Caldwell could not put the wires back into the ECM, and he recognized that connecting the wires and replacing the plugs would require that he completely remove the wiring harness attached to the ECM.

30.     On July 7, 2008, Caldwell called Pride and requested that Pride assist him in repairing and reinstalling the wiring harness. Pride and his associate, Bill Hartley, arrived at the KIMBERLY MARIE later that day to identify which plugs, pins, tools, and wiring schematics were necessary to properly repair and reinstall the wiring harness. Pride told Caldwell that the

plugs that attached the wiring harness to the ECM should be replaced and that the various clips at the ends of the wires that were inserted into the plugs should also be replaced. Caldwell testified that he and Pride discussed the presence of O-rings in the ECM, but did not discuss replacing the O-rings in the ECM of the KIMBERLY MARIE.

31.     Pride and Hartley remained on the vessel for approximately one hour. Johnson was not present during the time Pride and Hartley were on the KIMBERLY MARIE with Caldwell.

32.     Based on the credible testimony of Pride and Hartley, the Court finds that Caldwell never mentioned to Pride and Hartley that he found liquid in the boots that covered the ECM plugs.

33.     After identifying the necessary items, Pride called Milton CAT, the local Caterpillar engine dealer, and ordered the necessary parts and tools, which Johnson later picked up. Pride also lent Caldwell a Deutsch crimping tool that was necessary for the reinstallation.

34.     Caldwell removed the entire wiring harness and brought it back to his shop to undertake the necessary repairs. Caldwell spent approximately seven hours making repairs and then spent several hours testing the wiring harness to make sure that all the connections had been made properly. He also cleaned the rubber boots that covered the plugs.

35.     Caldwell returned to the KIMBERLY MARIE to reinstall the wiring harnesses, ECM plugs, and boots on the vessel's engine. After Caldwell completed the reinstallation, Johnson attempted a test run of the KIMBERLY MARIE's engine. At first, the engine did not start, but after Caldwell made an adjustment to a plug going into the ECM, Johnson successfully started the engine. Johnson then ran the engine for approximately 30-40 minutes. During the test run Caldwell was in the engine room looking directly at the engine to check for any issues.

He saw none, and he observed no leaks. Caldwell observed that the alternator was not hot. He also checked the circuit breaker for stray voltage and found it to be within normal operating range. No wires burned out during the test run. Caldwell also pulled back the boots on the ECM plugs to check for fluid, but he found the boots to be dry. Johnson observed no notices flashing on the instrument panel in the wheelhouse.

36.     Because Caldwell had been unable to locate the source of the stray voltage, he told Johnson to call him if the circuit breaker ever kicked in while Johnson was out fishing.

37.     Johnson called Pride to report that the engine was running. Johnson told Pride to send him – rather than Caldwell – the bill for Pride's work.

38.     The preponderance of the evidence does not prove that Pride and Johnson discussed replacing the ECM or that Pride told Johnson he was okay to go fishing.[4]

39.     Johnson did not fish on the KIMBERLY MARIE for approximately two weeks while he, Caldwell, and Pride addressed the engine issues.

40.     There is no evidence that any of the parts installed by Caldwell were installed improperly. This finding is supported by Defendants' expert witness, James Cuminskey, who opined that the work performed by Caldwell on the KIMBERLY MARIE was undertaken in a safe, reasonable, and workmanlike manner. In fact, as Plaintiff's expert David DuBois testified, Caldwell's repairs were made correctly, using the correct parts and procedures.

41.     Both Caldwell and Pride discharged their duties reasonably, appropriately, and in a workmanlike manner.

42.     The preponderance of the evidence does not prove that the advice provided by

---

[4] At trial, Johnson testified that Pride told him that he probably had a bad ECM and that although he would have to replace the ECM, Johnson was good to go fishing. Pride contradicted Johnson's testimony and stated that although he spoke with Johnson and Johnson reported that the engine was running, he never discussed replacing the ECM nor did he tell Johnson that it was okay to go fishing.

Pride to Caldwell concerning the parts and tools necessary for the rebuilding and reinstallation of the wiring harness was incorrect, unreasonable, or inappropriate. In fact, the credible testimony of James Cuminskey supports a finding that the advice Pride provided to Caldwell was correct, reasonable, and appropriate.

43.     Pride and Caldwell provided inconsistent testimony regarding whether or not Caldwell informed Pride about the presence of fuel in the boots. The Court need not make a determination as to whether Caldwell informed Pride of the presence of liquid in the boots because Caldwell made sure that the boots were clean and dry after test running the engine for thirty to forty minutes after he had completed the reinstallation of the wiring harness. In support of this finding, the Court credits the opinion of Defendants' expert James Cuminskey, who testified that while Caldwell should have informed Pride of the presence of liquid in the boots, a failure to have informed Pride would not have reflected a lack of workmanlike performance on the part of Caldwell.

44.     According to the credible testimony of James Cuminskey and Roger Hellyar-Brook, it was highly unlikely that any fuel leaked into the ECM. Additionally, as Cuminskey and Hellyar-Brook testified, it is likely that any leakage into the ECM would have shut down the engine or sent a fault message to the wheelhouse.

45.     On July 11, Johnson and his sternman, Walter Wyman, took the KIMBERLY MARIE lobster fishing for the first time in approximately two weeks. Before going out, Johnson checked the engine room and did not smell any fuel oil or observe anything out of the ordinary. Johnson ran the engine below 1,100 RPMs and experienced no problems with the KIMBERLY MARIE or its engine. Johnson observed no flashing engine lights and he smelled no fuel oil.

46.     Johnson and Wyman were out on the KIMBERLY MARIE for approximately six

to eight hours.  At the end of the day, Johnson and Wyman made plans to fish the next day, and Johnson told Wyman that he would pick up Wyman at 4:30 a.m.

47.     Johnson arrived at Wyman's house on July 12, 2008 between 4:30 and 4:45 a.m., but Wyman did not come to the door.

48.     Johnson proceeded to the harbor without Wyman and, after observing that the water was flat and the weather was good, decided to fish alone.

49.     As Plaintiff's expert David DuBois testified, going out in the KIMBERLY MARIE without a sternman was a questionable marine practice.

50.     With his boat loaded with lobster traps, Johnson steamed from Cundy's Harbor to an area known as the Hue and Cry off of Cape Elizabeth, Maine, where Johnson set his traps. After Johnson finished setting his traps, and approximately two hours after leaving Cundy's Harbor, he noticed the smell of fuel.  Despite smelling fuel, Johnson was determined to haul traps, which were set in an area known as Scantum Basin.  Johnson punched the necessary coordinates into his onboard computer and steamed for Scantum Basin.

51.     Soon thereafter, Johnson again noticed the smell of diesel fuel.  He put the engine in neutral, opened the engine hatch cover, and descended into the engine room.  Johnson looked at the starboard side of the engine and did not see anything that troubled him.  He proceeded back on deck, closed the hatch cover, and kicked the KIMBERLY MARIE into gear.  He took the engine to approximately 1,100 to 1,200 RPMs and decided to look for tuna fish as the boat steamed to Scantum Basin.  Johnson, however, was struck by the strong smell of diesel fuel.  He again descended into the engine room where Johnson observed fuel on the decking below him, on the engine, and on the generator, all on the portside of the engine room.

52.     Johnson immediately climbed out of the engine room and called Caldwell and

Pride, but neither answered the phone. Johnson then called his wife Kim and he asked her to get ahold of Pride. During this time, Johnson left the engine running.

53. Johnson did not act as a prudent seaman when he left the engine running after determining that there was a significant amount of fuel in the engine room.[5]

54. Pride called Johnson approximately twenty minutes later. Pride instructed Johnson to shut down the engine immediately and try to determine the source of the leak. Pride also informed Johnson that he would probably have to be towed home.

55. At trial, Johnson recalled that he and Pride also discussed that the ECM most likely had a bad O-ring. Pride, on the other hand, did not recall any discussion of a faulty O-ring. Pride's testimony is more credible.

56. After talking with Pride, Johnson shut down the engine and removed the small hatch cover – accessible from the wheelhouse and located directly above the engine – and looked down into the engine room, where he saw a large flame.

57. Upon seeing the flame, Johnson left the wheelhouse and went directly to the forecastle to grab his survival suit. Before leaving the wheelhouse en route to the forecastle Johnson, did not engage the fire suppression system, which was located in the wheelhouse. Johnson grabbed one survival suit from the forecastle but then realized that he had grabbed the wrong one, so he then grabbed the correct survival suit and returned to the wheelhouse. He then sent out a distress signal. Johnson did not engage the fire suppression system. The boat also had an automatic fire suppression system and Johnson believed that the automatic fire suppression system would kick in, but it failed to do so.

58. After grabbing the correct survival suit and sending a distress signal, Johnson

---

[5] To the extent there was differing testimony on this point, the Court credits the testimony of Defendants' experts James Cuminskey and Roger Hellyar-Brook, who both testified that Johnson did not act as a prudent seaman in leaving the engine running after observing a strong fuel smell.

proceeded to the stern of the KIMBERLY MARIE, where he attempted to don his survival suit. After some initial difficulties, Johnson put on his survival suit but only zipped it up to his chest. Johnson walked to the wheelhouse, surveyed the situation, and after contemplating what to do next and observing the copious amounts of smoke and intense heat, he made his way to the stern and entered the water via an aluminum chute. On the way into the water Johnson hit his head and his right side. Soon thereafter, the boat caught on fire, and it eventually sank. After waiting in the water for approximately forty-five minutes, another fisherman picked up Johnson, and he was brought to shore and to the hospital for treatment.

59.     Johnson did not look for any of the approximately 225 traps he had set in Scantum Basin until late October or early November 2008, more than three months after the KIMBERLY MARIE sank. At that time, Johnson was unable to locate any of his traps. Johnson never asked another fisherman to assist him in collecting his traps, and Johnson never spoke with the Maine Department of Marine Resources requesting a special dispensation that DMR collect his traps from Scantum Basin. In new condition, the traps were worth approximately $25,000.

60.     The source of what ignited the fire on the KIMBERLY MARIE was never conclusively determined. As Great American's expert David DuBois testified, he could not determine the source of the leak or what ignited the fire.

61.     As Defendants' expert James Cuminskey testified, it was more likely than not that the ECM was not the source of the fuel leak or the fire. The electronic parts of the ECM were sealed from outside liquid and even if liquid had made its way into the ECM either the ECM would have shut down or a warning code would have appeared in the wheelhouse. Moreover, as Cuminskey and Roger Hellyar-Brook testified, a leak in one of the fuel lines running through the ECM would have resulted in a drop in pressure that would have either caused the engine to shut

down or a warning to flash in the wheelhouse. Johnson testified that on July 12, 2008 the engine did not shut down until he turned it off and that no warning signals flashed in the wheelhouse while he was out fishing.

62. While a preponderance of the credible evidence supports a finding that the presence of a large quantity of exposed fuel in the engine room caused the fire onboard the KIMBERLY MARIE, the Court does not credit DuBois' opinion that the fuel leak necessarily emanated from the vicinity of the ECM.

## II. CONCLUSIONS OF LAW

1. The Court has admiralty jurisdiction over this case pursuant to 28 U.S.C. § 1333.

2. "Admiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as maritime law." Fairest-Knight v. Marine World Distributors, Inc., 652 F.3d 94, 98 (1st Cir. 2011) (citing Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 625 (1st Cir. 1994)). "In the absence of a relevant statute, the judicially-developed norms of the general maritime law, an amalgam of traditional common-law rules, modifications of those rules, and newly created rules, governs actions in admiralty." Id. (quoting La Esperanza de P.R., Inc. v. Cia. De P.R., 124 F.3d 10, 16 (1st Cir. 1997)). Although state law may supplement federal maritime law when the latter is silent or where a local matter is at issue, it "may not be applied where it would conflict with [federal] maritime law." Id. (internal quotation and citation omitted).

3. Great American and Johnson bring claims against Defendants for negligence and breach of the implied warranty of workmanlike performance. Great American's claims are based on subrogation. See Fowler v. Boise Cascade Corp., 948 F.2d 49, 59 (1st Cir. 1991)

("Subrogation refers to the placing of one party in the position of a second party with respect to the rights and obligations of a claim.").

**Negligence**

4.    "Negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law." <u>Pariseau v. Capt. John Boats, Inc.</u>, No. 09-10624-JGD, 2012 WL 527652, at *14 (D. Mass. Feb. 16, 2012) (citing <u>La Esperanza de P.R.</u>, 124 F.3d at 17). Therefore, for the purposes of Plaintiffs' negligence claim, "[Defendants'] conduct must be measured by the standards of maritime law rather than those of the state common law." <u>Id.</u> (citing <u>Kermarec v. Compagnie Generale Transatlantique</u>, 358 U.S. 625, 628 (1959)).

5.    "Establishing negligence under general maritime law requires the plaintiff to demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by the plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." <u>Evans v. Nantucket Cmty. Sailing, Inc.</u>, 582 F. Supp. 2d 121, 137 & n.35 (D. Mass. 2008) (citing <u>Canal Barge Co., Inc. v. Torco Oil Co.</u>, 220 F.3d 370, 376 (5th Cir. 2000)); <u>see also</u> 1 Thomas J. Schoenbaum, <u>Admiralty & Maritime Law</u> § 5-2 (5th ed. 2011).

6.    Plaintiffs have the burden of proving each element of the negligence claim by a preponderance of the evidence. <u>See</u> <u>Pariseau</u>, 2012 WL 527652, at *14 (citing <u>Marquette Transp. Co. v. La Mach. Co.</u>, 367 F.3d 398, 402 (5th Cir. 2004)); <u>Evans</u>, 582 F. Supp. 2d at 137 (citing <u>Naglieri v. Bay</u>, 93 F. Supp. 2d 170, 174-75 (D. Conn. 1999)).[6]

---

[6] In admiralty, the duty of care is derived from "the dictates of reasonableness and prudence." Schoenbaum, <u>Admiralty & Maritime Law</u> § 5-2. "A duty of care exists when injury is foreseeable or when contractual or other relations of the parties impose it." <u>Id.</u> "In determining the existence of duty, a court must examine and weigh the probability of an accident, the potential extent of the injury, and the cost of adequate precautions." <u>Id.</u> "The duty of reasonable care also extends to the duty to warn of harm that is reasonably foreseeable." <u>Id.</u>

A defendant breaches his duty to a plaintiff where the defendant "fails to protect other people against an unreasonable risk of harm." <u>Id.</u> A defendant breaches his duty of care where he fails "to observe that degree of care, precaution, and vigilance which the circumstances demand, the failure to observe the ordinary degree of care

7.     Plaintiffs contend that Pride was negligent in telling Johnson that he could go fishing while also telling Johnson that the ECM needed to be replaced. Plaintiffs, however, have failed to show by a preponderance of the evidence that Pride told Johnson that the ECM needed to be replaced. Plaintiffs have also failed to show that Pride told Johnson that he was okay to go fishing. Without establishing this factual predicate, Plaintiffs' cannot establish that Pride has breached any duty he may have to Johnson.

8.     Even assuming that Pride made the alleged statements to Johnson, Plaintiffs have failed to show that Pride's alleged statements were the actual and proximate cause of the fire and sinking of the KIMBERLY MARIE. "Causation under general maritime negligence law is similar to the common law which requires but for causation coupled with proximate or legal causation." Evans, 582 F. Supp. 2d at 144 (citing 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-3 (2004)). "The fault must not only be a but-for cause but the fault which produces liability must be contributory and proximate cause" of the injury. Id. (citing Inter-Cities Navig. Corp. v. United States, 608 F.2d 1079, 1081 (5th Cir. 1979)). "In other words, [t]o give rise to liability, a culpable act or omission must have been a substantial and material factor in causing" the injury. Id. (citing Inter-Cities Navig. Corp., 608 F.2d at 1081).

9.     Accordingly, because Plaintiffs cannot show that but for Pride's alleged statements the fire on the KIMBERLY MARIE would not have occurred and because Plaintiffs cannot show that the fire was the foreseeable result of Pride's alleged statements to Johnson, Plaintiffs' negligence claims against Pride must fail.

10.     Plaintiffs also contend that Pride was negligent in providing advice to Caldwell concerning the repair and reinstallation of the wiring harness. Plaintiffs, however, fail to show by a preponderance of the evidence that Pride's advice to Caldwell breached any duty to

which people of ordinary prudence would use under the same circumstances." Id.

Johnson.

11.    Plaintiffs have also failed to show by a preponderance of the evidence that Pride's advice or insufficient advice was the actual or proximate cause of the fire onboard the KIMBERLY MARIE.

12.    Plaintiffs allege that Caldwell was negligent in the following respects:  (1) by working on the ECM without the requisite training or knowledge; (2) by pulling the wires out of the plug of the ECM, thereby necessitating its replacement; (3) by not checking the condition of the O-rings in the ECM; (4) by approving the KIMBERLY MARIE to go out to sea without having checked the O-rings on the ECM; (5) by not identifying the source of the stray current; (6) by approving the KIMBERLY MARIE to go to sea despite having been told by Pride that the ECM unit would have to be replaced; and (7) by working on the KIMBERLY MARIE's electrical system without having an electrician's license or certification.

13.    Plaintiffs have not established by a preponderance of the evidence that Caldwell breached any duty to Johnson.

14.    Plaintiffs also failed to establish by a preponderance of the evidence that Caldwell's repairs actually and proximately caused the fire and sinking of the KIMBERLY MARIE.  Plaintiffs have failed to show that but for Caldwell's acts or omissions, the KIMBERLY MARIE would not have caught fire.  Moreover, Plaintiffs have failed to show that Caldwell's acts or omissions were a foreseeable cause of the July 12, 2008 fire onboard the KIMBERLY MARIE.

15.    Additionally, Johnson's poor seamanship on the July 12, 2008 undercuts Plaintiffs' arguments concerning causation.  While the Court need not rule on whether Johnson's acts and omissions break the chain of causation between Defendants' acts and the fire onboard

the KIMBERLY MARIE, the Court notes that Johnson left the engine running for a significant period of time after observing fuel in the engine room and failed to discharge the KIMBERLY MARIE's fire suppression system, despite having adequate time to do so. Even if Plaintiffs had made a showing that Defendants breached a duty to Johnson and their breach was the actual cause of the fire, Plaintiffs would have difficulty establishing proximate cause given the role Johnson's actions and omissions played in contributing to the fire and sinking of the KIMBERLY MARIE.

### *Res Ipsa Loquitur*

16.      The doctrine of *res ipsa loquitur*, which is fully applicable in admiralty, allows negligence to be proved by circumstantial evidence. The doctrine allows the finder of fact to infer negligence from the unexplained happening of an event which, in the ordinary course of things, would not occur in the absence of negligence. Before making such an inference, the finder of fact must determine by a preponderance of the evidence that

> (1) the thing which caused the injury was under the exclusive control of the defendant; (2) the injury is such as in the ordinary course of things does not occur if one having exclusive control exercises proper care; and (3) that the injury was not due to any negligence on the part of the plaintiff.

Schoenbaum, Admiralty & Maritime Law § 5-2 (citing O'Connor v. Chandris Lines, Inc., 566 F. Supp. 1275, 1279 (D. Mass. 1983); United States v. Baycon Indus., Inc., 804 F.2d 630 (11th Cir. 1986)); see also Tillson v. Odyssey Cruises, No. 08-10997-DPW, 2011 WL 309660, at *5-6 (D. Mass. Jan. 27, 2011); Ryba v. LaLancette, 417 F. Supp. 2d 199, 207 (D. Mass. 2006).

17.      Plaintiffs cannot successfully show that *res ipsa loquitur* applies in this case. Plaintiffs cannot show that the KIMBERLY MARIE or its engine was under the exclusive control of Defendants. In fact, the day after Caldwell reinstalled the wiring harness, Johnson took the KIMBERLY MARIE out to fish for between six and eight hours. During this time,

Johnson – not Defendants – had exclusive control over the KIMBERLY MARIE and its engine.

18.     Even if Plaintiffs could make a showing of exclusive control, a fire could have occurred onboard the KIMBERLY MARIE even if Defendants had exercised proper care.  Given the age and condition of the KIMBERLY MARIE, the cause of the fire could have been a fuel leak from a fuel line or hose, or an improperly jacketed exhaust system.  Of course, the source of the fire could have been something else completely.  Accordingly, Plaintiffs cannot satisfy the second factor, and the Court declines to apply the doctrine of *res ipsa loquitur*.

**Negligence Per Se**

19.     Plaintiffs contend that Caldwell was negligent per se in working on the KIMBERLY MARIE without an electrician's license.  Under 32 M.R.S.A. § 1201, electrical work can only be conducted by licensed electricians.  However, § 1102(3) of Chapter 32 states that the "provisions of this chapter shall not apply to the following: … the electrical work and equipment in … ships."  Plaintiffs contend that the exception in § 1102(3) does not apply to Caldwell because the KIMBERLY MARIE is a lobster boat not a ship.  Defendant Caldwell argues that the exception in § 1102(3) applies to this case because it is meant to apply broadly to both ships and boats.

20.     Under the traditional negligence per se analysis, "proof of a defendant's violation of a safety statute designed to protect the party who was injured against the type of injury which occurred, relieves the plaintiff from pleading the negligence elements of foreseeability, duty and breach."  Moody v. Boston & Maine Corp., 921 F.2d 1, 4 (1st Cir. 1990) (citing Pratico v. Portland Terminal Co., 783 F.2d 255, 262 (1st Cir. 1985); Restatement (Second) of Torts § 286 (1965)).  The Supreme Court has stated: "Sometimes the violation [of a safety statute] is described as 'negligence per se'; but we have made clear ... that that term is a confusing label for

what is simply a violation of an absolute duty. Once the violation is established, only causal relation is in issue." Id. (quoting Carter v. Atlanta & St. A.B.R. Co., 338 U.S. 430, 434 (1949)).

21.     The Court believes that Defendants correctly read the statute. However, even were the Court to accept Plaintiffs' argument, Plaintiffs' claim for negligence per se would still fail because Plaintiffs cannot establish that Caldwell's alleged violation of the statute caused – either actually or proximately – the fire onboard the KIMBERLY MARIE. Accordingly, Plaintiffs' claim for negligence per se fails.

22.     Plaintiffs also claim that Caldwell's failure to hold an electrician's license is strong evidence of negligence. This argument is misplaced. Caldwell's testimony established that he has over twenty-five years of experience as an electrician and that he has worked extensively on lobster boats. Johnson repeatedly hired Caldwell to work on his lobster boats, including the lobster boat that replaced the KIMBERLY MARIE after she burned and sank. The testimony regarding Caldwell's experience as a marine electrician outweighs any indication that Caldwell's lack of an electrician's license is evidence of his negligence.

**Implied Warranty of Workmanlike Performance**

23.     The implied warranty of workmanlike performance "parallels a negligence standard rather than imposing the strict liability that attaches to implied warranties in land-based contracts under the Uniform Commercial Code…." Fairest-Knight v. Marine World Distributors, Inc., 652 F.3d 94, 99 (1st Cir. 2011).

24.     Under the implied warranty of workmanlike performance, Plaintiffs have the burden of proving by a preponderance of the evidence that Defendants' conduct caused the injury. See id. (citing SS Amazonia v. N.J. Export Marine Carpenters, Inc., 564 F.2d 5, 8 (2d Cir. 1977) (stating that recovery under a breach of an implied warranty of workmanlike

performance claim requires showing that the sub-standard work performed caused the damage claimed); Marquette Transp. Co. v. La Mach. Co., 367 F.3d 398, 402 (5th Cir. 2004).

25. Plaintiffs have not shown by a preponderance of the evidence that either Pride or Caldwell employed improper repair procedures or used sub-standard parts. See Fairest-Knight, 652 F.3d at 101.

26. Plaintiffs have not shown by a preponderance of the evidence that either Pride or Caldwell misdiagnosed the specific problem reported by Johnson. See id. As discussed previously, Plaintiffs have not established that fuel existed in the boots on the day the KIMBERLY MARIE caught on fire. Moreover, even if Plaintiffs could make a showing that fuel existed in the boots or that there was a leak in the ECM, Plaintiffs failed to make any showing that such a leak caused the fire.

27. In short, Plaintiffs failed to show that the work undertaken by Caldwell and/or Pride caused the fire onboard the KIMBERLY MARIE on July 12, 2008. On the record presented, it is just as (if not more) likely the fire was caused by poor design, poor manufacture, poor maintenance, abuse of the boat by Johnson, abuse of the boat by its previous owner, or something else. See id.

28. While circumstantial evidence may in some cases be used to establish causation, the circumstantial evidence must allow for a strong inference of causation. See id. (citing Marquette, 367 F.3d at 402, 404). Exclusivity of control or possession is an important factor in supporting this inference. See id. In this case, however, Plaintiffs failed to show by a preponderance of the evidence exclusivity of control or possession, as Johnson took the KIMBERLY MARIE out lobstering the day after it was repaired, and he experienced no trouble with the engine or the vessel.

29.     Accordingly, without sufficient proof of causation, Plaintiffs fail to establish a viable breach of warranty claim.  See id. at 102-03.


### III.     JUDGMENT

For all the reasons set forth herein, the Court ORDERS that judgment shall be entered in favor of Defendants.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 16th day of March, 2012.